**BAUSCH & LOMB INCORPORATED and Consolidated Subsidiaries, Petitioners–Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

**No. 1428, Docket 89–4156.**

United States Court of Appeals, Second Circuit.

Argued May 10, 1990.

Decided May 14, 1991.

Dennis I. Meyer, Washington, D.C. (C. David Swenson, A. Duane Webber, Baker & McKenzie, Washington, D.C., of counsel), for petitioners-appellees.

Teresa E. McLaughlin, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Brian C. Griffin, Acting Asst. Atty. Gen., Gary R. Allen, Jonathan S. Cohen, Attys., Tax Div., Dept. of Justice, Washington, D.C., of counsel), for respondent-appellant.

Before ALTIMARI and MAHONEY, Circuit Judges, and TENNEY,* District Judge.

MAHONEY, Circuit Judge:

26 U.S.C. § 482 [1] authorizes the Commissioner of Internal Revenue (the "Commissioner") to reallocate gross income, deductions, credits, or allowances among commonly controlled entities in order to prevent tax evasion or clearly to reflect their income. Section 482 empowers the Commissioner to determine the taxable income of the commonly controlled entities as if they had conducted their affairs in the manner of unrelated entities dealing at arm's length. *See* Treas.Reg. § 1.482–1(b)(1).

In a notice of deficiency dated December 30, 1985 relating to the income tax liability

---

* The Hon. Charles H. Tenney, United States District Judge for the Southern District of New York, sitting by designation.

1. At all times relevant to this appeal, section 482 provided:

   In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.

The Tax Reform Act of 1986 added the following to section 482: "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Tax Reform Act of 1986, Pub.L. No. 99–514, § 1231(e)(1), 100 Stat. 2085, 2562–63 (1986). This amendment applies only to taxable years beginning after December 31, 1986, and only to intangibles transferred, or licenses granted, after November 16, 1985. *Id.* § 1231(g)(2)(a), 100 Stat. at 2563. The legislative history of the Tax Reform Act of 1986 includes the following statement concerning this amendment: "No inference is intended as to whether the same result could nevertheless be reached under present law for transfers prior to these effective dates." H.R.Rep. No. 426, 99th Cong., 2d Sess. 426, *reprinted in* 1986–3 C.B. (vol. 2) 1, 426.

of Bausch & Lomb Incorporated ("B & L") and its consolidated subsidiaries (the "B & L Group") for the tax years ended December 30, 1979, December 28, 1980, and December 27, 1981, the Commissioner reallocated to B & L a net amount of $2,359,331 for 1981, and $18,425,750 for 1982,[2] of gross income that had been reported as income of B & L's wholly-owned subsidiary, Bausch & Lomb Ireland, Ltd. ("B & L Ireland"). Finding the Commissioner's reallocations unreasonable, the Tax Court reduced them to $1,255,331 for 1981 and $4,173,000 for 1982. *See Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. 525, 581, 611 & n. 26 (1989). Decision was entered correspondingly determining the tax liability of the B & L Group for 1979–1981, and the Commissioner took this appeal.

We affirm.

### Background

The Tax Court's opinion provides a thorough presentation of the factual background of this case. *See* 92 T.C. at 529–80. We summarize the events most relevant to the issues presented for our determination. In doing so, we credit the findings of the Tax Court unless we perceive them to be clearly erroneous. *See Eli Lilly & Co. v. Commissioner*, 856 F.2d 855, 861 (7th Cir. 1988); *B. Forman Co. v. Commissioner*, 453 F.2d 1144, 1152 (2d Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2458, 32 L.Ed.2d 817 (1972).

In 1978, B & L was a major participant in the soft contact lens industry, controlling upwards of 50.6 percent of the United States market. Between 1978 and 1980, B & L prepared long range forecasts that predicted increasing demand for soft contact lenses in international markets, particularly in Europe. In 1978, B & L began to investigate the possibility of an overseas manufacturing facility to complement its existing plant in Rochester, New York. Responding to various incentives offered by the Industrial Development Authority of the Republic of Ireland ("IDA"), including

a tax holiday on all export profits through 1990, B & L determined to establish a manufacturing facility in Waterford, Ireland. The Tax Court:

> found as fact that [B & L] had sound business reasons for the establishment of B & L Ireland. [B & L] had reason to believe that manufacturing capacity at its Rochester facility was inadequate to meet expected increases in soft contact lens demand. [B & L] determined that it was prudent to establish additional manufacturing capacity overseas in order to minimize regulatory delays, establish an alternative supply source to the Rochester facility, and to have a facility capable of more efficiently servicing the increasingly important European markets. Ireland was determined to be the location at which these objectives could be realized most cost effectively due to the incentives offered by the Republic of Ireland to induce the location of manufacturing facilities within the Republic. Since a non-Irish company could not receive [IDA-sponsored] financing, there were sound business reasons for incorporating an Irish manufacturing facility rather than merely operating the facility as a division of B & L.

92 T.C. at 582–83.

Accordingly, B & L Ireland was incorporated on February 1, 1980, and B & L, B & L Ireland, and the IDA entered into an agreement on or about February 10, 1981 that specified the incentives to be provided for the venture by the IDA and the reciprocal commitments undertaken by B & L and B & L Ireland. B & L Ireland agreed, *inter alia*, not to enter into any royalty commitments, except that B & L Ireland could pay royalties to B & L or any subsidiaries in an amount not to exceed five percent of B & L Ireland's annual net sales.

Among the reasons for B & L's success was its manufacturing expertise. In the early 1960s, a Czechoslovakian chemist developed the "spin cast" method of manufacturing soft contact lenses, a process

---

**2.** The 1982 reallocation was pertinent to the tax liability for 1979, 1980, and 1981 because of net operating loss and foreign tax credit carrybacks.

that uses centrifugal force by injecting a mixture into a spinning mold. As a result of a number of licensing agreements and lawsuits, B & L obtained nonexclusive rights to use the patents secured on the first spin cast machines. B & L acquired two spin cast machines from the inventor and, between 1966 and 1981, made several significant process modifications that increased the yield of usable lenses to a commercially acceptable level. Through 1982, B & L was the only manufacturer in the United States using the cost effective spin cast method. Thus, B & L was able to produce lenses at a cost of $1.50 each, which was far below its competitors' costs. During 1981 and 1982, for example, a competitor of B & L had per unit costs of over $4.00 using a cast molding process, and over $6.00 using a lathing process.

In January 1981, B & L granted B & L Ireland a nonexclusive license to manufacture lenses using B & L's spin cast technology. In addition, the license agreement entitled B & L Ireland to any improvements resulting from B & L's ongoing research and development in the manufacture of contact lenses, and permitted B & L Ireland to sell soft contact lenses anywhere under B & L's trademarks. In exchange, B & L was to receive a royalty of five percent of the subsidiary's net contact lens sales. The agreement was terminable upon the written notice of either party.

B & L Ireland began manufacturing lenses in March 1981. It performed all processing, packaging, inspecting, and labeling at its Waterford facility, with the exception of some insignificant expiration date labeling on a limited number of lenses done in Rochester in 1981. Thus, when lenses left Ireland, they were ready for sale to optical practitioners and chains. B & L Ireland's unit sales were 1,116,000 and 3,694,000 lenses for the years 1981 and 1982, respectively. B & L was under no contractual obligation to purchase any lenses from B & L Ireland, but sixty-one percent of B & L Ireland's total sales in 1981 and fifty-six percent in 1982 were to B & L for resale in the United States. The balance of B & L Ireland's sales were to overseas affiliates of B & L. Throughout that two year period, the intercompany transfer price was $7.50 per lens. The purchasers also paid the duty and freight charges, which in the case of B & L were $0.62 per lens.

The Commissioner's proposed deficiency sought to "reflect an arm's length consideration for the use of [B & L's] intangible assets by B & L Ireland" by limiting B & L Ireland to "a net profit before taxes of 20 percent of sales." The notice of deficiency, invoking section 482, accordingly reallocated from B & L Ireland to B & L taxable income in the amounts of $2,778,000 and $19,793,750 for the years 1980 and 1981, respectively, with an offsetting elimination of the royalty income that B & L Ireland had reported for those years, resulting in a net reallocation of $2,359,331 for 1981 and $18,425,750 for 1982. In response to B & L's petition to the Tax Court for redetermination of the deficiencies, the Commissioner further contended that the reallocation was necessary "because of the lack of arms-length pricing between" B & L and its subsidiary.

The Tax Court was presented with nearly 200 pages of stipulated facts, and conducted an eight day trial. At the outset of its opinion, the court determined that the transfer price that B & L paid to B & L Ireland for lenses and the royalty rate that B & L Ireland paid to B & L for use of its manufacturing technology and related intangibles had independent significance, and thus should be examined separately. 92 T.C. at 584. First, the court upheld the $7.50 per lens transfer price as adequately supported by comparable price data. *Id.* at 589–93. The court was also of the view that its determination could be sustained under the alternative resale price method. *Id.* at 593–94. Second, the court rejected the royalty rates suggested by each side and, drawing upon the expert testimony presented by the parties as well as other evidence in the record, concluded that reallocation should be based upon a royalty rate equal to twenty percent of B & L Ireland's net sales. 92 T.C. at 611.

This appeal followed.

### Discussion

■ We consider at the outset the standards governing our review. We are guided by *Eli Lilly & Co.*, which addressed this question as follows:

We are unaware of any decision discussing the standard that governs appellate review of a Tax Court's reallocation. One might argue that appellate review of the Tax Court's allocations should parallel the Tax Court's review of the Commissioner's allocation—that the allocation should be upheld unless a de novo review of the facts shows it to be arbitrary, capricious or unreasonable. However, we lack the fact-finding capabilities that are essential to resolving factual discrepancies under that standard—especially conflicts involving disparate expert testimony. Our usual standards of review must therefore apply. The Tax Court's legal conclusions will receive plenary review. Factual findings will be reversed only if "clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "Mixed questions of law and fact," entailing the application of a legal standard to a given factual pattern, are reviewed under the clearly erroneous standard. *Standard Office Bldg. Corp. v. United States,* 819 F.2d 1371, 1374 (7th Cir.1987).

*Id.,* 856 F.2d at 860–61; *see also B. Forman Co.,* 453 F.2d at 1152.

We next address the merits of the appeal. In doing so, we will follow the approach of the Tax Court, addressing seriatim: (1) whether the transfer price that B & L paid to B & L Ireland for lenses and the royalty rate that B & L Ireland paid to B & L for use of its manufacturing technology and related intangibles had independent significance and thus should be examined separately; and if so, whether the Tax Court committed clear error in valuing (2) the transfer price for the lenses and (3) the royalty rate for the intangibles. Preliminarily, however, we summarize the applicable regulations, which are "binding on the Commissioner." *United States Steel Corp. v. Commissioner,* 617 F.2d 942, 947 (2d Cir.1980); *see Lansons, Inc. v. Commissioner,* 622 F.2d 774, 776–77 (5th Cir. 1980).

### A. *The Regulatory Background.*

The Commissioner has adopted regulations implementing section 482 that are pivotal to the decision of this case. First, as to the transfer price for lenses, Treas.Reg. 1.482–2(e)(1) provides that in the event of a transfer of tangible property between commonly controlled entities

at other than an arm's length price ..., the district director may make appropriate allocations between the seller and the buyer to reflect an arm's length price for such sale or disposition. An arm's length price is the price that an unrelated party would have paid under the same circumstances for the property involved in the controlled sale. Since unrelated parties normally sell products at a profit, an arm's length price normally involves a profit to the seller.

*Id.* Treas.Reg. § 1.482–2(d)(1) and (2), which deals with transfers of intangible property between commonly controlled entities, provides an essentially identical rule applicable to the royalty paid by B & L Ireland for the use of B & L's intangibles.

Section 1.482–2(e) goes on to specify particular methods to deal with the transfers of tangible property, to wit:

1) The comparable uncontrolled price method relies upon the price prevailing in comparable sales between entities that are not members of the same control group. § 1.482–2(e)(2).

2) The resale price method starts with the price which the buyer in the controlled sale is anticipated to charge upon resale to an entity outside the control group; that resale price is then reduced by the profit markup of a comparable uncontrolled buyer/reseller. § 1.482–2(e)(3).

3) The cost plus method adds to the cost of producing the subject property a markup equal to the profit percentage of a comparable uncontrolled seller. § 1.482–2(e)(4).

These methods must be applied sequentially. That is, "[i]f there are comparable uncontrolled sales ..., the comparable uncontrolled price method must be utilized because it is the method likely to result in the most accurate estimate of an arm's-length price...." § 1.482–2(e)(1)(ii). "If there are no comparable uncontrolled sales, then the resale price method must be utilized if the standards for its application are met...." *Id.* If not, either the resale price method or cost plus method may be used, "depending upon which method is more feasible and is likely to result in a more accurate estimate of an arm's-length price." *Id.* If the standards for applying one of the three methods are met, that method must be utilized "unless the taxpayer can establish that, considering all the facts and circumstances, some [other] method of pricing ... is clearly more appropriate." § 1.482–2(e)(1)(iii). If however, none of the three methods can reasonably be applied in a given case, "some appropriate method of pricing other than those described ..., or variations on such methods, can be used." *Id.*

The general theory of the cited regulations, as well as the others promulgated by the Commissioner to implement section 482, is to treat each of the individual members of a commonly controlled group as a separate entity, transactions between which are taxable events to be conformed to the economic realities that would obtain between independent economic entities conducting the identical transactions at arm's length. *See Commissioner v. First Sec. Bank,* 405 U.S. 394, 400 & n. 10, 92 S.Ct. 1085, 1090 & n. 10, 31 L.Ed.2d 318 (1972) (quoting Treas.Reg. 1.482–1(b)(1) (1971)); Note, *Multinational Corporations and Income Allocation Under Section 482 of the Internal Revenue Code,* 89 Harv.L. Rev. 1202, 1205, 1209 (1976) ("Note"). This contrasts with the alternative theoretical model, the unitary entity theory, which considers all commonly controlled entities as "parts of the same unitary business," with the result that "intercompany transactions cannot produce a real economic profit or

loss and must therefore be eliminated from tax consideration." Note at 1206.

We now turn to the issues addressed by the Tax Court.

## B. *Independent Significance of Transfer Price and Royalty Rate.*

■ The Tax Court framed this issue in the following terms:

As a preliminary matter, we must first address [the Commissioner's] contention that it is inappropriate to analyze the transfer price and royalty rate used by B & L separately, on the theory that B & L and B & L Ireland would have constructed their relationship in a different manner had they been conducting their affairs at arm's length. [The Commissioner] argues that B & L would never have agreed to license its spin cast technology which allowed it to produce soft contact lenses for approximately $1.50 per lens and then purchase lenses from the licensee for $7.50 per lens. [The Commissioner] argues that B & L would have been unwilling to pay an independent third party much more than its costs would have been had it chosen to produce the contact lenses itself. [The Commissioner] is indifferent as to whether the royalty is increased or the transfer price is decreased as long as the result is that B & L Ireland receives only its costs of production and a reasonable mark up. In essence, [the Commissioner] argues that B & L Ireland was little more than a contract manufacturer the sale of whose total production was assured and who thus was not entitled to the return normally associated with an enterprise which bears the risk as to the volume of its product it will be able to sell and at what price.

92 T.C. at 583.[3]

The Commissioner's position is not without force. It failed, however, to persuade the Tax Court, which concluded that B & L

---

3. As will appear, the Commissioner's formulation (and the Tax Court's corresponding analysis) of his position in "contract manufacturer"

terms was undoubtedly an effort to fit that position within the framework of the applicable Treasury regulations.

was not committed to purchase the entire output of B & L Ireland, and that B & L Ireland accordingly should not be considered a contract manufacturer entitled only to a modest markup on its manufacturing costs. 92 T.C. at 584; *see also Eli Lilly & Co.*, 856 F.2d at 863–64 & n. 9 (rejecting Commissioner's "contract manufacturer" contention); *G.D. Searle & Co. v. Commissioner*, 88 T.C. 252, 373 (1987) (same). The Tax Court further noted that B & L Ireland was not guaranteed a continuing $7.50 resale price, and that the price declined to $6.50 in 1983 as a result of market pressures. 92 T.C. at 584. It is undoubtedly true, as the Commissioner contends, that B & L was in a general sense committed to the success of B & L Ireland. We nonetheless find no clear error in the Tax Court's conclusion that:

> The most that can be said is that B & L Ireland had certain expectations as to the volume and price of lenses it could anticipate selling to B & L or its affiliates. However, such expectations are no different than those which any supplier has with regard to the business of a major customer and do not constitute a guarantee which effectively insulated B & L Ireland from market risks.

*Id.; accord, Sundstrand Corp. v. Commissioner*, 96 T.C. No. 12, slip op. at 187 (Feb. 19, 1991).

Furthermore, the structure of the Commission's regulations argues against the "contract manufacturer" thesis advanced by the Commissioner. The allowance of a markup of production costs, as the contract manufacturer theory postulates and as the Commissioner's notice of deficiency in this case explicitly provided (D.A. 74), is simply an application of the cost-plus method provided in the Commissioner's regulations. *See* Treas.Reg. § 1.482–2(e)(4). Those regulations explicitly provide, however, that the comparable uncontrolled price method is to be utilized, in preference to the cost-

plus method, if the conditions for application of the former method are satisfied. *See* Treas.Reg. § 1.482–2(e)(1)(ii). Since, as will hereinafter appear, we find those conditions to be fulfilled in this case, we are accordingly constrained by section 1.482–2(e)(1)(ii) to reject the Commissioner's contention that B & L Ireland should be treated as a contract manufacturer.

We therefore proceed to independent consideration of the Tax Court's treatment of the transfer price paid by B & L for the lenses manufactured by B & L Ireland, and the royalty rate paid by B & L Ireland to B & L for the use of B & L's intangibles.

### C. *Transfer Price for Lenses.*

■ The Commissioner contends that the Tax Court erred in finding that the standards for the comparable uncontrolled price method were met.[4] That method must be applied if, but only if, comparable uncontrolled sales are available. Treas.Reg. § 1.482–2(e)(1)(ii). The Commissioner focuses on the meaning of the term "comparable," on which the regulations elaborate as follows:

> Uncontrolled sales are considered comparable to controlled sales if the physical property and circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales, or if such properties and circumstances are so nearly identical that any differences either have no effect on price, or such differences can be reflected by a reasonable number of adjustments to the price of uncontrolled sales. For this purpose, differences can be reflected by adjusting prices only where such differences have a definite and reasonably ascertainable effect on price.

*Id.* § 1.482–2(e)(2)(ii).

The Tax Court premised its ruling upon numerous sales by four different lens man-

---

4. The Tax Court, while recognizing that it need not consider B & L's alternative argument that the resale price method would support a $7.50 transfer price, noted that this approach lent further support to its determination of the transfer price issue. *See* 92 T.C. at 593–94. Since our ruling with respect to the comparable uncontrolled price method is adequate to decide that issue on this appeal, we decline to consider the outcome that would result from application of the resale price method.

ufacturers to unrelated lens distributors. All comparable sales prices were reduced by $0.62, an adjustment that compensated for B & L's unique practice of paying the duty and freight charges on its lens purchases. After this adjustment, all these sales were at a price that exceeded the $7.50 transfer price paid by B & L, with one exception. One manufacturer, the Amsco/Lombart division of the American Sterilization Company, transacted some sales (less than half) that, when adjusted, indicated a transfer price less than $7.50, but the Tax Court gave these sales little weight because, unlike the uniform price charged by B & L Ireland, they set different prices for standard and thin lenses. All other adjusted comparable sales, including Amsco/Lombart single price sales, indicated a transfer price above $7.50, with many exceeding $10.00.

The Tax Court's conclusion that these sales were comparable was premised on findings of fact that B & L functioned as a distributor with respect to the lenses it purchased from B & L Ireland, and that the soft contact lenses at issue were generally considered a fungible commodity. The Commissioner disputes the former finding. He contends that in addition to its distribution functions, B & L "supplied the know-how necessary to manufacture the lenses, the Bausch & Lomb and Soflens trademarks, the FDA approval required for sales on the United States market, the fruits of its ongoing research and development, and ready-made foreign and domestic markets."

We find this argument unconvincing. As was implicit in our prior determination that the transfer price for lenses and royalty rate for intangibles should be accorded independent consideration, the provision of know-how, trademarks, FDA approval, and ongoing research and development is properly taken into account hereinafter with respect to the royalty to be imputed to B & L Ireland on an arm's-length basis for the transfer of these intangibles. Further, the provision of ready made markets is entirely consistent with the role of a distributor.

The position urged by the Commissioner would preclude comparability precisely because the relationship between B & L and B & L Ireland was different from that between independent buyers and sellers operating at arm's-length. This, however, will always be the case when transactions between commonly controlled entities are compared to transactions between independent entities.

We addressed a similar contention by the Commissioner in *United States Steel Corp. v. Commissioner*, 617 F.2d 942 (2d Cir. 1980). The Commissioner there argued that identically priced shipping services supplied to competitors of United States Steel by its subsidiary were not comparable to the services supplied by the subsidiary to United States Steel because of the special parent/subsidiary relationship that existed between them. We responded that the Commissioner's approach might "recognize economic reality; but [would] also ... engraft a crippling degree of economic sophistication onto a broadly drawn statute, which—if 'comparable' is taken to mean 'identical', ...—would allow the taxpayer no safe harbor from the Commissioner's virtually unrestricted discretion to reallocate." *Id.* at 951.

Similarly, the position urged by the Commissioner herein amounts to reading so broadly the requirement in Treas.Reg. § 1.482–2(e)(ii) that the "circumstances involved" in comparable uncontrolled sales and controlled sales under section 482 review be "identical," or "nearly identical," as to threaten effective nullification of the comparable uncontrolled price method. That method is postulated in the Commissioner's regulations, however, as the method of choice for testing transfers of tangible property between commonly controlled entities. We therefore decline to adopt the suggested interpretation of section 1.482–2(e)(ii).

D. *The Royalty Rate for B & L's Intangibles.*

■ The relevant regulation provides two methods for determining an arm's-length price for the transfer or use

of intangible property. If the transferor has made similar transfers to unrelated parties, "the amount of the consideration for such transfers shall generally be the best indication of an arm's length consideration." § 1.482–2(d)(2)(ii). In the absence of an adequately similar transaction, the arm's-length consideration may be determined with reference to a lengthy list of applicable factors. § 1.482–2(d)(2)(iii).

The 1981 licensing agreement provided that B & L Ireland would pay royalties to B & L in the amount of five percent of B & L Ireland's total sales. Conceding that this royalty was unreasonably low, B & L presented expert opinions at trial that an arm's-length consideration would have been five percent of the average price realized by B & L and its subsidiaries upon the sale of the lenses to unrelated third parties ("ARP"). The Commissioner's experts calculated a much higher rate, between twenty-seven and thirty-three percent of ARP.

The Tax Court rejected the positions presented by both parties' experts. Concluding that there were no sufficiently similar transactions upon which to base an arm's-length rate, the court focused on two of the factors listed in the applicable regulation: the "[p]rospective profits to be realized ... by the transferee through its use ... of the property," and the "capital investment and starting up expenses required of the transferee." § 1.482–2(d)(2)(iii)(g) and (h). The court relied primarily upon a proposal made by B & L to the IDA in early 1980, related internal B & L projections, and especially a Special Expenditure Application ("SEA") submitted to B & L management on October 15, 1980 with respect to the Waterford facility as the best indications of (1) the profits that an independent entrepreneur would anticipate from the use of spin cast technology, and (2) the capital investment required to generate those profits.

The Tax Court made two adjustments to the SEA projections in order to reflect the approach of a "prudent investor" in the circumstances. First, the court reduced the projected output at the Waterford facility during the years 1986 through 1989 to account for anticipated "erosion in the demand for both standard and thin lens sales as prolonged wear lenses made of new materials became available." Second, the court made reductions in projected transfer prices for 1983 and beyond on the basis that lower cost competitors would enter the market and drive down prices.

Reasoning that the purpose of a licensing agreement is to divide the profits attributable to use of the licensed intangibles, the Tax Court then reached the following determination:

> Using our best judgment, we find that at arm's length B & L Ireland would have been willing to invest in the lens production facility even if required to share approximately 50 percent of the profits therefrom with B & L as consideration for use of its intangibles.... [T]his equates to a royalty rate of 20 percent of [B & L Ireland's] net sales.

92 T.C. at 611; *cf. G.D. Searle & Co.*, 88 T.C. at 376 (royalty rate determined on basis of court's "best judgment based on a consideration of the entire record before [it]"); *Ciba–Geigy Corp. v. Commissioner*, 85 T.C. 172, 236 (1985) (same).

In response to this analysis, the Commissioner contends that the SEA projections did not correspond to the actual experience of the parties because: (1) the Waterford facility ended up with greater manufacturing capacity than the projections had assumed; and (2) a decision was made in late 1981 for that facility to maximize lens production by producing for the United States market, whereas the SEA projections assumed production primarily or exclusively for foreign markets. Since the license agreement between B & L and B & L Ireland was terminable at will, the Commissioner contends, B & L would have scrapped the agreement, if dealing at arm's length with an independent party, and insisted upon the negotiation of new terms.

We are not persuaded. Considerable deference to the Tax Court's evaluation of trial evidence, and especially expert testimony, is appropriate in appellate review of this sort of complex factual determination. *See Eli Lilly & Co.*, 856 F.2d at 872. Here, as in *R.T. French Co. v. Commissioner*, 60 T.C. 836 (1973), another case involving sec-

tion 482 reallocation of royalties paid to a foreign affiliate, the Tax Court was entitled to conclude that "[w]hat later transpired in no way detracted from the reasonableness of the agreement when it was made." *Id.* at 852.

It is true that in *R.T. French Co.* the agreement had a fixed term, *see id.,* whereas here the agreement between the parties was terminable at will. We regard this as too thin a foundation, however, for the Commissioner's argument that B & L would surely have terminated the agreement and negotiated new terms if dealing with an independent licensee, at least in the absence of a fuller record as to the manufacturing alternatives available to B & L at the time it was decided to increase lens production at B & L Ireland. *Cf. Sunstrand Corp.,* slip op. at 169 (rejecting ready availability of alternative source of manufacture in view of specialized manufacturing know-how required to produce complex avionic device). Accordingly, we perceive no basis to reject the Tax Court's carefully considered determination as clearly erroneous.

## Conclusion

The decision of the Tax Court is affirmed.