NISSHO IWAI AMERICAN CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nissho Iwai American Corp. v. Commissioner
Docket No. 1702-83.
United States Tax Court
T.C. Memo 1985-578; 1985 Tax Ct. Memo LEXIS 56; 50 T.C.M. (CCH) 1483; T.C.M. (RIA) 85578; November 26, 1985. Jerome Kamerman and Steven Kamerman, for the petitioner. David N. Brodsky and Anthony A. Falzone, for the respondent. KORNER
*57 MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioner's income taxes and liabilities for withholding of income taxes at the source in the amounts and for the taxable years as follows: Taxable Year
Income Tax
Liability for withholding
Ended
Deficiency
Income Tax at source
December 31, 1973
$845,106
$171,038
December 31, 1974
60,268
December 31, 1975
457
641,715
December 31, 1976
953,309
March 31, 1977
2,139,680
By amendment to his answer, respondent asserted a deficiency in withholding tax for the taxable year 1976, in the amount of $193,636.87. [1]
*58 In its petition, petitioner claims overpayment of income tax, as follows: Taxable Year Ended
Claimed Overpayment
December 31, 1976
$273,889
March 31, 1977
359,133
After concessions, the issues remaining for us to decide are: (1) Whether respondent's determination that additional income should be allocated to petitioner with respect to the sale of logs from the "Key Timber property" to petitioner's parent for the years 1973, 1974 and up to June 30, 1975, under the authority of section 482, [2] is arbitrary, capricious, or unreasonable; (2) whether the above alleged additional income with respect to the sale of logs from the "Key Timber property" by petitioner to its parent corporation constituted constructive distributions subject to withholding of income tax at the source under section 1442; (3) whether the journal entries, purporting to reflect cancellation, on July 1, 1975, of the agreements between petitioner and its parent, dated October 1, 1968, and November 17, 1967, and the substitution of new agreements therefor, should be recognized for Federal income tax purposes; and (4) whether petitioner's net profit from the sale of the "Key Timber property" *59 to an unrelated third party in its tax year ended March 31, 1977 should be increased by $4,457,665. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulations of facts, and exhibits attached thereto are incorporated herein by this reference. Nissho Iwai American Corporation (hereinafter "NIAC" or "petitioner"), [3] a New York corporation engaged in business as a trading company, had its principal place of business in New York, New York, at the time of filing its petition in this case. Petitioner is a wholly owned subsidiary of Nissho Iwai Corporation (hereinafter "NIC" or "parent"), [4] a Japanese corporation, engaged in business as a trading company, with its principal office in Tokyo, Japan. Petitioner timely filed its returns [5] for the years herein at issue. *60 The Nissho Pacific Corporation (hereinafter "NPC") [6] was a California corporation and wholly owned subsidiary of petitioner. NPC was merged into petitioner effective September 30, 1968. The Pacific Northwest Forest Products Industry
Beginning around 1960, Japanese trading companies entered the log market in the Pacific Northwest region of the United States, seeking significant quantities of logs for export to Japan. Initially, the Japanese trading companies primarily purchased logs from the big timberland owning companies with large supplies of old growth timber, such as Weyerhaeuser, Crown Zellerbach, and Rayonier. As Japanese homebuilding construction increased in the early sixties, the demand for U.S. logs increased and the trading companies expanded their purchasing activities. The Japanese trading companies created U.S. subsidiaries whose function was to purchase logs from various sources and to maintain a steady flow of logs to their parent companies so as to enable the latter to meet the needs of their *61 customers. The entry of the Japanese trading companies into the Pacific Northwest log market came at a time when lumber and plywood mill capacity had expanded beyond the ability of the private and public forests to meet timber requirements. Many of the small independent lumber mill operators sought tracts of private timber to be used as reserves and logged only when an adequate supply of timber cutting rights from federal and state forests could not be obtained. The small independent lumber mills were equipped with the latest technology; per unit costs were reduced by operating at an optimum daily rate. Any failure to obtain a full quota of logs made it necessary to close down the mills. The small independent operators organized to stop log exports from federal lands and from the large timberland holdings of the State of Whshington. [7] The exportation of logs from federal lands was restricted in October 1968. *62 The struggle to halt log exports from public lands resulted in intensified efforts by the Japanese trading companies to assure a steady supply of logs, and drove export prices well above domestic prices. In several instances, the Japanese trading companies paid more for unprocessed logs than they would have had to pay for finished lumber. The large timberland-owning companies were in a position to take advantage of both the spot market [8] and the more stable markets provided by longer term contracts where the prices were adjusted every quarter. Some companies entered into exclusive contracts with Japanese trading companies, whereby they agreed to sell the logs they generated on a commission basis, rather than to the highest bidder. NIAC's Log Sales
One of petitioner's business activities was the purchase of logs in the United States and the resale of the export grade logs to NIC in Japan. Grades of logs were determined by an independent third *63 party scaling bureau, based upon a book of rules. The difference among the grades reflected the potential end product from a log. Export grade logs consisted of hemlock, spruce, red cedar, Douglas fir, and white pine of the grades peeler, No. 1 sawlog, No. 2 sawlog, and No. 3 sawlog. Domestic grade logs were all lower grades, such as No. 4 sawlog and pulp. Export grade red cedar, however, included No. 4 sawlog. Other factors which reflected upon the grade included length, clarity and knots in the wood. Petitioner's logs were classified according to the specifications listed by the Grays Harbor Scaling and Grading Bureau. The minimum diameter and log length requirements, by species, were as follows during the years 1971 through 1976: Douglas
Grade
Fir
Hemlock
Spruce
Cedar
1 Peel
[9] 30"/17'
2 Peel
30"/17'
3 Peel
24"/17'
Peeler/Select
24"/17'
30"/16'
Special Mill
16"/17'
16"/17'
16"/17'
1 Sawlog
30"/16'
24"/16'
24"/12'
28"/16'
2 Sawlog
12"/12'
14"/12'
14"/12'
20"/12'
3 Sawlog
6"/12'
6"/12'
6"/12'
6"/12'
For its own internal recordkeeping purposes, petitioner *64 established its own grades of export market hemlock, known as GHEM and SHEM. The GHEM grade included all grades of hemlock from the best or peeler, down to No. 1 sawlog, and some good quality of special mill grade. The SHEM grade included No. 2 sawlog, No. 3 sawlog, and some bad quality of special mill. In the United States, the common scale used to measure the volume of logs (in terms of board feet) is the Scribner scale. NIAC and its parent entered into an agreement, dated October 1, 1968, which provided as follows: Nissho-Iwai Co., Ltd., (hereinafter called "NIC") with Head Office at 30, Imabashi 3-chome, Higashiku, Osaka, Japan and Nissho-Iwai American Corporation (hereinafter called "NIC-American") with Office at 110 Wall Street, New York, The United States of America Hereby agree: 1. The agreement entered into by both parties on January 1st., 1968 is hereby terminated and is substituted by this Agreement as set forth hereunder. 2. NIC shall pay to NIC-American a share of Commission for all sales and purchases performed through intermediary of NIC-American at the following rates. (a) For outright sales and purchases between NIC and NIC-American. 1.0% (b) For sales *65 and purchases by NIC with third parties through NIC-American as broker. 0.5% (c) In the case of Bulky Cargoes (any shipment of Raw Materials imported into Japan exceeding $100,000 in Value per shipment) the rate of share for the category (a) is to be 0.5%, and for the category (b) is to be 0.25%. 3. This Agreement shall be applicable to all transactions to be concluded between NIC-American and all NIC's Offices in Japan. 4. This agreement shall remain in force and effect for a period of one year from the date hereof and shall be automatically renewed from year to year for one year, unless either party by giving to the other party a three-month prior notice in writing inform of its intention not to renew for another year term. In a letter dated May 1, 1969, NIC confirmed an agreement between NIC and NIAC pursuant to which petitioner was to acquire and hold in inventory a maximum of 50,000,000 Scribner feet of export quality logs for resale to NIC at prices to be negotiated from time to time, but not less than cost. [10]
*66 The letter provided, in pertinent part, as follows: You are to advise us from time to time as to the amounts which you are expending for the purchase of logs and in the event that your costs become higher than the amount which we are willing to pay for logs we reserve the right to cancel the arrangement set forth in this letter by notifying you in writing of our election to do so. In the event that we cancel this agreement we will notify any financing institution of the cancellation if it shall request us in writing to do so. Any cancellation will not affect our obligation with respect to logs which you have acquired or contracted to acquire prior to the date of cancellation. The agreement was amended on April 15, 1970, effective May 1, 1970, to increase the maximum of Scribner feet that NIAC was to inventory from 50,000,000 to 200,000,000. One of the sources of logs for export to Japan used by petitioner was the purchase of State of Washington cutting rights. Petitioner was assisted by Elmore Boom Company, Inc. (hereinafter "Elmore") in its acquisition of timber cutting rights from the State of Washington. Elmore informed NIAC and supplied prospectuses of the offering *67 of cutting rights which met NIAC's requirements. The prospectuses included a legal description of the land, estimates of volume and grades of the timber and of the cost of developing the site, including building roads, cutting, bucking, and delivery of the logs to their final destination. If Elmore's management considered that the offering met NIAC's requirements, and that the timber would produce logs which satisfied NIAC's specifications, it would present the prospectus of the sale to NIAC and request approval to run a reconnaissance survey, or "cruise" of the site. Subsequent to receiving approval and performing the survey, Daniel G. Williams, Elmore's general manager and president from 1971 on, would prepare an appraisal of the offering, which included a comparison of the said appraisal with the state's prospectus. Based on the information and prospectuses provided by Elmore, petitioner computed the estimated F.A.S., viz, free alongside ship, cost of the logs which would be obtained from each offering. The estimated F.A.S. cost included the estimated bid price for the timber cutting rights, development costs, and all other costs which would be incurred in connection with *68 the logs, up to but not including loading them in ships destined for Japan, as well as an interest expense on all cash outlays, and wharfage. NIAC would then transmit to NIC in Japan its estimate of the F.A.S. cost of the logs available, together with the timber inspection reports and cost estimation reports supplied by Elmore. Based on the information supplied by NIAC, NIC would decide whether it wanted to buy the logs to be produced. If NIC agreed to purchase logs from a particular offering of cutting rights by the State of Washington, NIAC would instruct Elmore to enter a bid in its name, on petitioner's behalf. In order to qualify to bid on a State of Washington timber cutting rights sale, a deposit of 10 percent of the appraised value of the sale was required. NIAC provided this money to Elmore. If the bid was successful, a performance bond had to be given. NIAC also paid for the performance bond. If the bid was successful, Elmore supervised the harvesting of the timber and assisted NIAC with the collection, storage, and processing of the export grade logs for sale to NIC. Pursuant to the agreement between NIAC and Elmore, Elmore was paid a fee for its services, based *69 on the volume of logs handled and exported by NIAC to Japan. [11]NIAC paid the charges for all logs, timber, and timberland acquired by Elmore on its behalf, all taxes imposed on the logs, timber, and timberland, logging, building of roads, procurement of building material and hauling or towing of logs, fees paid to independent scalers, expenses incurred for the storage of logs elsewhere than at Elmore's yard, legal fees, insurance, log patrol expenses, port fees, and all other payments related to the agreement between NIAC and Elmore. Elmore was responsible for the payment of salaries and expenses of its own employees, the cost of renting its own processing yard and office, and all materials, equipment, and supplies necessary to perform its duties. *70 In most cases, the period of time allowed for removing logs from the area of cutting rights acquired from the State of Washington was three years, but an extension of time could be obtained for a charge, if it was not convenient to cut the timber in the three-year period. Other sources of logs for export to Japan were the purchase of private timber and timberland, and the purchase of logs from independent loggers. Sales by M&R to NIAC
Between September 1968 and April 1975, petitioner entered into a series of contracts with M&R Timber, Inc. (hereinafter "M&R"), pursuant to which M&R agreed to sell all export quality logs produced from cutting rights it acquired on state timberlands to NIAC. Petitioner sold the logs it purchased from M&R to NIC at cost plus a one percent commission. The contracts for the period between September 27, 1968 and December 22, 1972, provided a stated price, by species and grades, for logs. The prices were on the basis of delivery F.A.S. at the M&R dock or Port Angeles, Washington. Grading and scaling was to be made by a Puget Sound Log Scaling and Grading Bureau Scaler, at seller's expense. No commission, computed on the price of the logs *71 or otherwise, was payable to M&R. Some of the contracts provided for desired length of logs and top diameter. Most of them provided for advance payments to M&R. A period for delivery was specified, from less than a month to 4 years and 10 months from the date of the contract. Some of the contracts provided that delivery was to be made not earlier than at a certain date, or to be agreed upon later. The contract dated June 27, 1972 provided for the upward or downward revision of quoted prices one year from the date of contract if the actual costs of production, viz, roads, logging, and hauling increased or decreased in relation to the costs estimated to NIAC. The contracts between M&R and NIAC dated January 1, 1973 to October 9, 1973, specified the price, quantity, and quality of logs to be exported on a F.A.S. M&R dock or Port Angeles delivery basis to Japan. The contracts also provided terms for payment. With the exception of the contracts dated January 12, 1973, April 2, 1973, July 13, 1973, and October 9, 1973, the contracts provided for the upward or downward revision of the prices within one year from the date of the contract if the actual costs of production, viz, roads, *72 logging and hauling, increased or decreased in relation to the estimate of costs presented to NIAC. The contracts dated April 2, 1973, June 4, 1973, July 13, 1973 and October 9, 1973, provided that F.A.S. prices had been calculated to allow M&R a $13.88, per thousand Scribner feet, profit. Prices were to be adjusted to insure said amount of profit. Delivery was to be made between less than 1 month, and 3 years and 3 months from the date of the contracts. The contracts did not provide for the payment of a commission to M&R. The contracts between M&R and NIAC dated February 19, 1974 to July 25, 1975, provided specific prices, quantities, top diameters, and desired length of logs to be exported. Prices were determined on the basis of delivery F.A.S. M&R dock or Port Angeles. Delivery was to be made prior to a certain date between 2 years and 2 months, and 3 years and 2 months from the date of the contract. Prices were to be revised downward or upward within 1 year from the date of the contracts if the actual costs of production increased or decreased in relation to the estimated costs presented to NIAC. The contracts provided for performance deposits and advance payments. The *73 contracts did not provide for the payment of a commission to MPR by NIAC. The contract for 1975, dated April 25, 1975, between M&R and NIAC provided for the sale of specified species, lengths, grades, and quality of logs. Prices were on the basis of delivery F.A.S. M&R dock or Port Angeles. The contract contained specific provisioins in connection with payment, performance deposit, and advance payments by NIAC. Delivery of the logs was to be made prior to September 30, 1978. The agreement did not provide for the payment of a commission. Prices were subject to revision upward or downward within 1 year from the date of the contract if the actual costs of production, viz, roads, logging, and hauling increased or decreased in relation to the estimated costs. Sales between Dant & Russell and Ataka
Ataka America, Inc. (hereinafter "Ataka"), a subsidiary of another Japanese trading company, was engaged in the business of exporting logs during the years in issue. Dant & Russell, Inc. (hereinafter "Dant & Russell") was a corporation, with offices in Portland, Oregon, engaged in the operation of saw mills and the acquisition of timber for its customers, export companies, during *74 the years herein at issue. Dant & Russell obtained timber through the acquisition of Washington State and Federal cutting rights or private land. From approximately 1961 through the mid-seventies, Dant & Russell had an exclusive log sales agreement with Ataka. Dant & Russell provided Ataka with propsectuses of cutting rights offerings issued by the Department of Natural Resources of the State of Washington, and an estimate of the approximate cost of cutting the timber. Based on the estimate and prospectus furnished by Dant & Russell, on a third party timber cruise, and the approval of its parent company, Ataka would decide whether it wanted to acquire the offered cutting rights. Upon a favorable decision by Ataka, Dant & Russell would did for the state-owned cutting rights. Ataka woudl provide the amount of the bidding deposit. If the bid was successful, Dant & Russell arranged for the logging and supervised the work until the logs were produced for export. Domestic quality logs were sold to other buyers, but Ataka agreed to purchase all of the export logs. The price Ataka paid for the logs was a build-up cost including stumpage fees, logging road building, trucking, and all *75 other costs.Pursuant to the agreements between Dant & Russell and Ataka, Dant & Russell was paid a commission that ranged from 2.5 percent to 5 percent for its services. The higher commission of 5 percent applied to sales where the logs were delivered to Dant & Russell's own yards and where its personnel and staff were required to supervise the logging and handling of the logs. The lower rate of 2.5 percent applied to back-to-back deals, viz, transactions in which logs were purchased from other log dealers for resale to Ataka. The contracts were usually for three years. Dant & Russell also acquired private land with timber on it on behalf of Ataka, with interest-free funds furnished by Ataka, on at least two occasions. In order to arrive at stumpage prices for the timber, the appraised value of the land was deducted at the time of acquisition. After the timber was cut, the bare land was sold and the proceeds turned over to Ataka. The contracts pursuant to which Dant & Russell was to acquire land and timber for the purpose of selling logs to Ataka had no prescribed period for the cutting of timber. NIAC's Purchase of the Key Timber Property
In March 1967, U.S. Plywood *76 - Champion Papers, Inc. (hereinafter "Plywood") offered to sell to petitioner the Key Timber property, consisting of approximately 12,000 acres of land and standing timber, which Plywood estimated contained 200,000,000 Scribner feet of timber, at a price of $6,000,000. Key Timber consisted of 30 to 50 noncontiguous parcels of land in the State of Washington. Approximately one-half of the acreage was located in Clallam County, one-third of the acreage was located in Jefferson County, and one-sixth was located in Grays Harbor County. Petitioner notified NIC of Plywood's offer. NIC required NIAC to submit a feasibility study before making a decision with regard to Key Timber. NIAC retained Floyd Dickinson, a forester and surveyor, to perform a survey of the quantity, quality, and species of timber, viz, a cruise report, on Key Timber. Dickinson's report showed the following merchantable timber on the Key Timber property: Species
Scribner Feet
Export Quality
Hemlock
115,185,990
56.9%
Red Cedar
41,823,650
45.2%
Spruce
6,975,200
61.9%
Douglas Fir
1,671,000
70.0%
Pine
5,010
50.0%
Total
165,660,850
According to Dickinson's report the estimated *77 logging costs, per 1,000 feet, were as follows: Clallam County
$41
Jefferson County
$31
Grays Harbor
$28-$30
As to quality, Dickinson found the hemlock a little knottier than state owned timber, but it had no defects. Western red cedar was a little brownish, but of good quality. Dickinson found that the spruce and Douglas fir were better than average. According to Dickinson the value of the land, 12,122.04 acres, was $560,000, or $46 per acre. This estimate was deemed conservative. Regrowth value was estimated at $296,263.50. In addition to Dickinson, one of NIAC's employees surveyed some 3,000 acres of Key Timber. NIAC transmitted Dickinson's report of the timber cruise to NIC. NIC's lumber department employees prepared a document entitled "Approval Notice," dated November 17, 1967. Based on the information received from NIAC, NIC estimated the costs connected with the production of export quality logs from Key Timber by calculating the stumpage, logging costs, property taxes, road usage fees, other development and shipping costs, and interest on the unrecovered portion of the purchase price. An independent logger consulted by NIC determined estimated *78 logging costs as follows: Clallam County
$40
Jefferson County
43
Grays Harbor
30
Based on Dickinson's report and the estimate provided by an independent logger, NIC estimated logging costs, as follows: Percentage
Logging Cost
Scribner feet
of Total
(per 1,000 feet)
Clallam County
84,495,000
50%
$40
Jefferson County
51,439,000
31%
43
Grays Harbor
29,726,850
18%
30
The average logging cost was, therefore, $39.13 per thousand Scribner feet. NIC further considered the possibility that income would be earned from the exchange of domestic grade (pulp) logs which would be produced as part of the logging operation, from regrowth of the timber after cutting, and from the eventual sale of the timberland after the marketable timber was removed. NIC believed, in November 1967, that the timber from Key Timber would be entirely cut and sold within three to three and one-half years of the proposed purchase from Plywood. NIC concluded that it was imperative to acquire private owned timberland in order to maintain a flow of export quality of logs to Japan. On November 17, 1967, petitioner (through its subsidiary NPC) [12] *79 and NIC entered into the following agreement: 1. Nissho Pacific [NIAC] proposes to purchase timber properties from U.S. Plywood Co. for maximum price of $6,000,000 for purpose of producing logs for sales to Nissho. This agreement shall be applicable to all sales of logs produced from the timber properties. 2. Nissho [NIC] shall pay to Nissho Pacific [NIAC] the cost plus 4% commission for all logs produced from the timber properties for export to any of Nissho's Offices in Japan. 3. Nissho [NIC] shall guarantee Nissho Pacific [NIAC's] cost of logs produced from the timber properties which are not saleable in Japan. 4. Nissho [NIC] reserves the right to cancel this Agreement at any time if it shall pay to Nissho Pacific [NIAC] the cost for the timber properties and all logs produced from the timber properties. Paragraph 4 of the foresaid agreement -- which granted to NIC the right to cancel the agreement at any time -- was included in order to protect petitioner in the event of an embargo on the export of logs from the United States. The four percent commission was based on the F.A.S. cost of the logs produced from Key Timber, including *80 stumpage, interest on the unrecovered investment, [13] property taxes, road building, logging, truck hauling, scaling, grading, sorting, processing, tonnage service charge, wharfage, and losses from the sale of domestic quality logs. The commission rate of four percent was set by petitioner after consultation with Elmore. Elmore informed petitioner that the prevailing rate of commission was between 3 and 5 percent of the contract price. Sometime prior to December 11, 1967, petitioner caused Key Timber Company (hereinafter "KTC"), a Washington corporation, to be formed. On December 11, 1967, KTC purchased Key Timber, as trustee for NIAC, from Plywood, at a price of $5,500,000. [14] The funds for the purchase of Key Timber were obtained by increasing petitioner's loan accounts with approximately 10 banks located in the United States. Petitioner and NIC agreed, inter alia, in a document entitled "General Understanding on Key Timberland," dated March 19, 1968, as *81 follows: 1. Pertaining to the timber on the captioned timberland, all the risks and accounts to be derived therefrom belong to TOKYO [NIC] on the basis of the cost calculation method on the development of the timber which includes the mutually agreed commission to PORTLAND [NIAC]. 2. Pertaining to the land of the captioned timberland, all the risks and accounts belong to PORTLAND [NIAC] due to the nature of the transaction. 3. In the event that any remarkable change caused by economical, political or any other factors including an act of God, etc. which would unable [sic] both or either party to carry out the aforementioned items, both parties shall discuss the matter immediately. From November 1967, through June 1975, NIAC paid all real estate taxes, road maintenance, fire warden, and other expenses related to Key Timber. Petitioner capitalized the interest accruing on the unrecovered purchase price based on the prevailing interest rates. Sales of Key Timber Logs to NIC
During 1973, 1974, and up to July 1, 1975, petitioner sold to NIC, at petitioner's cost plus a four percent commission, the following quantities and species of export quality logs produced *82 from Key Timber for the calendar quarters indicated (in thousand board feet, Scribner scale): 1973
Calendar
Western
Sitka
Douglas
Quarter
SHEM
GHEM
Red Cedar
Spruce
Fir
1st Quarter
2nd Quarter
1,146.09
166.96
214.19
3rd Quarter
3,493.06
379.35
483.94
4th Quarter
833.43
247.20
327.16
Total
5,472.58
793.51
1,025.29
1974
Calendar
Western
Sitka
Douglas
Quarter
SHEM
GHEM
Red Cedar
Spruce
Fir
1st Qtr
82.38
9.27
85.58
2nd Qtr
1,214.87
.50
497.91
3rd Qtr
1,150.00
393.28
356.39
27.18
4th Qtr
Additional
unallocated
sales
72.09
7.51
.60
19.33
Total
2,519.34
410.56
356.99
630.00
1975 (up to July 1)
Calendar
Western
Sitka
Douglas
Quarter
SHEM
GHEM
Red Cedar
Spruce
Fir
1st Qtr
1,902.45
24.09
170.91
352.83
26.62
2nd Qtr
375.44
3.83
3.23
.41
Total
2,277.89
24.09
174.74
356.06
27.03
During calendar years 1973 through June 30, 1975, the F.A.S. selling price of the logs sold by petitioner to NIC was as follows: Year
Selling price
1973
$1,194,806
1974
576,695
1975
475,916
*83 Respondent's Pricing Adjustment
In his notice of deficiency, respondent determined that the transactions involving sales of timber from the Key Timber property by NIAC to NIC were not at arm's-length terms, and allocated additional income to petitioner, as follows: Year Ended
Additional Income
December 31, 1973
$1,693,933
December 31, 1974
602,680
December 31, 1975
327,948
Respondent multiplied NIAC's gross annual sales of logs from the Key Timber property to NIC, by species, by an average price (indicated infra). [15] The source of the prices determined by respondent was the Pacific Northwest and Range Experiment Station, United States Forest Service's figures, which were based on the composite log sales analyses of the Industrial Forestry Association, Portland, Oregon (hereinafter "IFA"). The source of the percentage of grades used by respondent was documents provided to respondent, during the course of the examination prior to the filing of the petition herein, by Laventhol Krekstein Horwath & Horwath, the firm of certified public accountants retained by petitioner to prepare the financial reports of its Portland, Oregon, branch for, among *84 other years, the taxable year ended December 31, 1975. Respondent then subtracted the actual price charged by NIAC from the amount above in order to obtain the alleged additional gross income. The computation is as follows: 1973
Average
Species
[16]Quantity [17]Price Total
SHEM
5,472.58
$331
$1,811,424
Western Red Cedar
793.51
399
316,610
Sitka Spruce
1,025.29
742
760,765
Corrected Selling Price
$2,888,799
Petitioner's Selling Price
1,194,806
Pricing Adjustment
$1,693,993
1974
Average
Species
[16]Quantity [17]Price Total
SHEM
2,519.34
$276
$ 695,338
Western Red Cedar
410.56
359
147,391
Sitka Spruce
356.99
493
175,996
Douglas Fir
630.00
255
160,650
Corrected Selling Price
$1,179,375
Petitioner's Selling Price
576,695
Pricing Adjustment
$ 602,680
1975
Average
Species
[16]Quantity [17]Price Total
SHEM
1,000.93
$260
$260,242
Western Red Cedar
1,487.10
275
408,953
Sitka Spruce
314.58
385
121,113
Douglas Fir
57.20
237
13,556
Corrected Selling Price
$803,864
Petitioner's Selling Price
475,916
Pricing Adjustment
$327,948
*85 Respondent purported to apply the comparable sales method in making the aforesaid determination. Based on the report of respondent's expert witness subsequent to the issuance of the notices of deficiency, respondent has reduced the amount of additional income for 1973 and 1974 to $1,061,641 and $489,948, respectively, thus conceding the larger amounts originally determined by him. Kenneth E. Beil, respondent's expert, determined total fair market values for export logs for the years 1973, 1974, and the first half of 1975, as follows: Fair Market
Year
[18]Volume Value
1973
7,295.04
$2,256,447
1974
3,900.79
1,066,643
1975
2,860.11
806,615
In determining the fair market value of export logs in 1973, 1974 and 1975, Beil purported *86 to apply the comparable sale price method. Beil utilized two sources of data, viz, the "IFA Composite Logs Sales Analyses," [19] and tables obtained from "Production, Prices, Employment, and Trade in Northwest Forest Industries," a publication of the United States Forest Service Pacific Northwest Forest and Range Experiment Station (hereinafter the "USFS data").
Beil took NIAC's annual sales of logs from Key Timber, by species, and multiplied them by an average price, weighted by the percentage of each grade of export logs provided by respondent, in order to arrive at a composite average price of export logs for each species and quarter. The composite average price was then adjusted by the USFS data for the Port of Aberdeen. Beil assumed that the timber mix on Key Timber and that of the USFS's data were similar. Beil adjusted the IFA composite price by the difference between the IFA price and the USFS price for each quarter. In some cases an upward adjustment was necessary, in other cases a downward adjustment was required. Beil relied on the statement of grade proportions contained *87 in a document entitled "Evaluation of Standing Timber on the Base of Fair Market Values as of July 1, 1975," in weighing the average prices of timber. This document (whose origin is unknown) was utilized by petitioner's head accountant in determining the yearend balance of standing inventory of Key Timber as of December 31, 1975. The IFA is a trade association of timber companies in the Pacific Northwest, including some engaging in exporting from their own lands. The IFA collects log sales invoices from its members (i.e., those who respond to IFA's request) and presents the data in "Composite Log Sales Analyses" for several districts, of which the Grays - Willapa Harbors District is one, by quarters, by year. Data are collected for water, inland, and export sales. Export log sales represent sales of export quality logs. IFA data are not based on prices F.A.S., but on some point short of F.A.S. There is no definite point of processing upon which all log sale invoice data is based. Export log specifications may vary between users, but are essentially the higher quality log within a log grade, viz, straight and clear, with little defect. Log length is an important consideration *88 in pricing export logs. There is, therefore, the opportunity for a considerable range in price between logs within the same grade. IFA data represent only approximately 25 percent of the market in the Grays - Willapa Harbors area, based upon those firms which respond to IFA's request for data. The IFA data are reported by species and grade, and reflect a wide range of transactions. Data developed from IFA data are compiled and presented in the quarterly publication of the United States Forest Service Pacific Northwest Forest and Range Experiment Station. Respondent used data relating to the average value of softwood log exports for the Port of Aberdeen for the years 1965-76 in determining the fair market value of logs sold by petitioner to NIC. Termination of NIAC's Log Sales Business
On July 1, 1975, NIAC held an inventory of cut logs, consisting of 46,330,823 Scribner feet, as per the agreements between NIAC and NIC dated October 1, 1968, May 1, 1969, and the amendment dated April 15, 1970. NIC was obligated, pursuant to the said agreements, to purchase NIAC's inventory at its cost of $17,807,099, [20] plus a one percent commission at the time of purchase. The fair market *89 value of the inventory was $11,717,889. Petitioner's capitalized cost in the standing timber remaining on Key Timber, 68,740,000 Scribner feet, was $2,865,577. The fair market value of said timber was $8,956,385 on July 1, 1975. On July 1, 1975, NIAC and NIC signed a memorandum of understanding which provided, in pertinent part, as follows: In the past NIC has purchased logs from whatever source produced for prices equal to NIAC's cost plus a percentage for commission. The parties wish to continue their business relationship, but on a basis whereby transactions between them will be based upon log prices which represent the fair market value of logs purchased by NIC at the time of agreement for purchase. Now, therefore, the parties agree as follows: 1. NIAC will continue to offer logs to NIC for import into Japan and will use its best efforts to fulfill NIC's requirements. NIAC will give NIC the first right to buy logs available.Subject to this, NIAC *90 is free to sell logs to other buyers whenever it chooses. 2. The price for each shipment of logs to be sold by NIAC to NIC will be negotiated between the parties at the time of NIC's order. The basis for negotiation of price will be the fair market value of the logs to be exported from the United States of America at the time of order. A second memorandum of understanding dated July 1, 1975, stated in pertinent part, as follows: In conformity with the Memorandum of Understanding between NIAC and NIC dated July 1, 1975, the parties agree that on this date NIAC will take over all risks, liabilities and obligations from NIC with respect to a log and standing timber inventory which NIAC holds as of this date. The transaction between the parties will be made on the basis of fair market value which the parties agree herein set forth: 1. As of this date, NIAC holds a log inventory consisting of 46,330,823 board feet, Scribner log scale. The parties agree that the fair market value of this inventory is $11,717,889.00. 2. As of this date, NIAC owns directly or indirectly standing timber from which it is estimated that 68,740,000 board feet of logs, Scribner scale, may be produced. *91 The parties agree that the fair market value of this inventory is $8,956,385.00. 3. All risks, liabilities and obligations with respect to the land upon which the standing timber is located and any profit or loss from the disposition thereof will continue to be for the account of NIAC. Petitioner purported to reflect the agreement contained in the two memoranda of July 1, 975, in its books and records by making the following journal entries: Re: Key Timber:
a. Debit to accounts receivable of $1,492,697.89 and credit to prepaid expense in the same amount. The entry purported to record NIC's alleged obligation to petitioner, in the amount of $1,492,697.89, for the accumulated interest cost resulting from the purchase of Key Timber in 1967. The prepaid expense account was reduced by a similar amount. b. Debit to accounts receivable of $1,372,879.03 and credit to inventory in the same amount. This entry purported to record NIC's alleged indebtedness to NIAC for the unrecovered cost of Key Timber, $1,372,879.03. NIAC's timber inventory was reduced by the same amount. c. Debit to inventory in the amount of $8,956,385 and credit to accounts receivable NIC-Tokyo in *92 the same amount. The purpose of this entry was to record Key Timber as inventory on NIAC's books at its current fair market value, and that petitioner owed NIC that sum. Restated in more simple and standardized double entry journal form, the entries were: Dr.
Cr.
(a) Accounts receivable
$1,492,697.89
Prepaid interest expense
$1,492,697.89
(b) Accounts receivable
1,372,879.03
Standing timber inventory
1,372,879.03
(c) Standing timber inventory
8,956,385.00
Accounts receivable
8,956,385.00
The effect of double entries (a) and (b) was to cause NIC to reimburse (i.e., pay) petitioner for its accumulated unrecovered costs with respect to the Key Timber land and the standing timber thereon. The effect of double entry (c) was to cause petitioner to pay for (i.e., "buy") the Key Timber property and its standing timber by crediting NIC for the fair market value thereof. All of this was accomplished by adjustments to petitioner's accounts receivable; no money changed hands. Re: Cut log inventory:
d. Debit to accounts receivable in the amount of $17,807,098.50 and credit to inventory in the same amount. This entry purported to record that *93 NIC allegedly owed petitioner $17,807,098.50 for the cost of cut logs held in inventory as of July 1, 1975, and that petitioner's inventory was reduced by a corresponding amount. e. Debit to inventory in the amount of $11,717,888.88 and credit to accounts receivable in the same amount. This entry records that petitioner allegedly owed NIC the amount of $11,717,888.88, representing the fair market value of the cut logs which it "purchased" for its own account, and that petitioner's inventory was increased by such amount. f. Debit to accounts receivable in the amount of $1,598.46 and credit to purchases in the same amount. The purpose of this entry was to record the alleged net profit on all the above transactions. Again, restated in simple accounting terms, the entries were: Dr.
Cr.
(d) Accounts receivable
$17,807,098.50
Cut log inventory
$17,807,098.50
(e) Cut log inventory
11,717,888.88
Accounts receivable
11,717,888.88
(f) Accounts receivable
1,598.46
Profit on sales
1,598.46
The effect of double entries (d) and (e) was to credit, i.e., reimburse, petitioner for the cost of its cut log inventory, as compared to the fair market value, *94 which was the lesser figure. The effect of double entry (f) was to record as a "profit," the difference between the total of the transactions in items (a) through (c), and the total of the transactions in items (d) and (e). [21]
No bills of sale or documents reflecting transfers of title were executed by either NIC or petitioner in connection with the transactions reflected above. Beginning July 1, 1975 and at all relevant times thereafter, petitioner sold logs from its cut log inventory to NIC at the prevailing fair market values. Between July 1, 1975, and December 31, 1975, NIC sold 31,720,110 feet of the July 1, 1975 cut log inventory to NIC at a sales price of $8,267,967.27. Between January 1, 1976, and September 10, 1976, the remaining balance of cut logs, consisting of 14,608.493 feet, was sold by petitioner to its parent for $3,730,778.30. [22]
*95 Sale of Key Timber
On December 28, 1976, KTC and petitioner, and EMT, Inc. (hereinafter "EMT"), a Washington corporation unrelated to either NIAC or KTC, entered into an agreement pursuant to which KTC and NIAC were to sell, and EMT was to buy, Key Timber on or before February 28, 1977, for a price of $8,600,000. On February 27, 1977, KTC, on behalf of petitioner, sold Key Timber to EMT for a price of $8,600,000. Petitioner reported ordinary income of $2,362,189 from the sale of Key Timber, using an adjusted cost basis of $6,237,811. Respondent reduced petitioner's cost basis to $1,785,146, and determined additional income accordingly; respondent now concedes that the gain was capital. OPINION Issue 1. Respondent's section 482 adjustments and Issue 2. Constructive dividends
Section 482 empowers respondent to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among commonly controlled organization, trades, or businesses, if he determines that such is necessary to prevent the evasion of taxes or clearly to reflect their income. There is no question that petitioner and its Japanese parent corporation are "owned or *96 controlled directly or indirectly by the same interests," within the meaning of section 482. See section 1.482-1(a)(3) and (4), Income Tax Regs.
The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer. Huber Homes, Inc. v. Commissioner,55 T.C. 598, 605 (1971); section 1.482-1(b)(1), Income Tax Regs. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer, viz, whether the transactions in issue would have been entered into by independent and unrelated parties dealing at arm's length. Ciba-Geigy Corporation v. Commissioner,85 T.C. 172 (1985); Hospital Corporation of America and Subsidiaries v. Commissioner,81 T.C. 520 (1983); Achiro v. Commissioner,77 T.C. 881 (1981); section 1.482-1(b)(1), Income Tax Regs. As succinctly stated by Bittker and Eustice: The major thrust of § 482 is the prevention of artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises. The regulations also warn that distortions of income may invoke application of *97 this section even though the taxpayers act in good faith and with an absence of tax-avoidance motives. In effect, then, § 482 seems to be an amalgam of several important themes and policies of the tax law: tax-avoidance principles, assignment-of-income notions, general deduction theories, and clear reflection of income under the parties' accounting methods. * * * [Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.06, pp. 15-15--15-16 (4th ed. 1979); footnote omitted.] Respondent has considerable discretion in applying section 482 and his presumptively correct determination must be sustained unless that discretion has been abused. Spicer Theatre, Inc. v. Commissioner,346 F.2d 704 (6th Cir. 1965), affg. 44 T.C. 198 (1964); Grenada Industries, Inc. v. Commissioner,17 T.C. 231 (1951), affd. 202 F.2d 873 (5th Cir. 1953), cert. denied 346 U.S. 819 (1953). Petitioner generally bears the burden of proving that respondent's determination was arbitrary, capricious, or unreasonable.[23]Hospital Corporation of America and Subsidiaries v. Commissioner,supra; *98 Your Host, Inc. v. Commissioner,489 F.2d 957, 960 (2d Cir. 1973); Phillip Brothers Chemicals, Inc. (N.Y.) v. Commissioner,435 F.2d 53, 57 (2d Cir. 1970); Ach v. Commissioner,42 T.C. 114, 125-127 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966). Our decision as to whether or not respondent has abused his discretion turns upon questions of fact. Ballentine Motor Co. v. Commissioner,321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962); Foster v. Commissioner,80 T.C. 34, 160 (1983), *99 affd. 756 F.2d 1430 (9th Cir. 1985); American Terrazzo Strip Co. v. Commissioner,56 T.C. 961, 971 (1971). We must examine all of the facts and circumstances to determine whether respondent has abused his discretion. Should petitioner prove respondent's determination to be arbitrary, capricious, or unreasonable, the general presumption of correctness no longer applies. Eli Lilly & Co. and Subsidiaries v. Commissioner,84 T.C. 996, 1131 (1985); Woodward Governor Co. v. Commissioner,55 T.C. 56, 65 (1970). Petitioner may also overcome the presumption by introducing evidence sufficient to prove that the transactions in issue satisfied the arm's-length standard contained in section 482. Should petitioner overcome respondent's presumption of correctness and disprove the deficiencies determined by respondent, we must determine from the record before us the proper allocations, if any, of gross income between petitioner and its parent, NIC. Eli Lilly & Co. and Subsidiaries v. Commissioner,supra at 1131-1132. See Nat Harrison Associates, Inc. v. Commissioner,42 T.C. 601, 617 (1964); Ach v. Commissioner,42 T.C. at 126. *100 An arm's-length price is the price that an unrelated and uncontrolled party would have paid under the same circumstances for the property involved in the sales in issue. "Since unrelated parties normally sell products at a profit, an arm's-length price involves a profit to the seller." Section 1.482-2(e)(1)(i), Income Tax Regs.[24] The regulations, in subparagraphs (2), (3), and (4) of section 1.482-2(e), Income Tax Regs., describe three methods of determining an arm's-length price -- the comparable uncontrolled price method, the resale price method, and the cost plus method -- and the standards for applying each method. [25] If there are comparable uncontrolled sales, the comparable uncontrolled price method must be utilized "because it is the method likely to result in the most accurate estimate of an arm's-length price." Section 1.482-2(e)(1)(ii), Income Tax Regs. If there are no comparable uncontrolled sales, the resale method must be used if the standards for its application are met. If neither the comparable uncontrolled price method nor the resale method can be used, the cost plus method is applicable. Where none of the above-mentioned methods can reasonably be applied under *101 the facts and circumstances of a particular case, a variation on such methods, or some appropriate method, can be used. Section 1.482-2(e)(1)(iii), Income Tax Regs.
Respondent determined that the prices paid by NIC to petitioner in 1973, 1974, and 1975 were not arm's-length prices and allocated to petitioner additional income, in the amount of $1,693,933, $602,680, and $327,948 for the respective years. Based on the report of respondent's expert witness subsequent to the issuance of the notices of deficiency, respondent reduced the adjustments for 1973 and 1974 to $1,061,641 and $489,948, respectively. In making the foregoing determination, respondent purported to apply the comparable uncontrolled price method. Under the comparable uncontrolled price method, the arm's-length price of a controlled *102 sale is equal to the price paid in comparable uncontrolled sales. Uncontrolled sales are sales in which the seller and the buyer are not members of the same controlled groups, including sales made: (1) by a member of a controlled group to an unrelated party; (2) to a member of the controlled group by an unrelated party; and (3) in which the parties are not members of the controlled group and are not related to each other. Section 1.482-2(e)(2)(ii), Income Tax Regs.
The section 482 regulations determine the comparability of uncontrolled and controlled sales, as follows: Uncontrolled sales are considered comparable to controlled sales if the physical property and circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales, or if such properties and circumstances are so nearly identical that any differences either have no effect on price, or such differences can be reflected by a reasonable number of adjustments to the price of uncontrolled sales.For this purpose, differences can be reflected by adjusting prices only where such differences have a definite and reasonably ascertainable effect on price. *103 If the differences can be reflected by such adjustment, then the price of the uncontrolled sale as adjusted constitutes the comparable uncontrolled sale price. Some of the differences which may affect the price of property are differences in the quality of the product, terms of sale, intangible property associated with the sale, time of sale, and the level of the market and the geographic market in which the sale takes place. Whether and to what extent differences in the various properties and circumstances affect price, and whether differences render sales noncomparable, depends upon the particular circumstances and property involved. * * * [Section 1.482-2(e)(2)(ii), Income Tax Regs.] In arriving at a "comparable uncontrolled sale price," respondent's expert Beil relied on two sources of data, the IFA composite log sales analyses, and tables from "Production, Prices, Employment, and Trade in Northwest Forest Industries" a quarterly publication of the United States Forest Service Pacific Northwest Forest and Range Experiment Station. As stated in our findings of fact, supra, the IFA composite log sales analyses are derived from invoices provided, on a voluntary basis, *104 by its members. Some of the tables and information complied by the Pacific Northwest Forest and Range Experiment Station are based on the IFA composite log sales analyses, and some are compiled from Department of Commerce records. Only the IFA composite log sales analyses present prices by species and grade. We do not think that respondent's determination of a "comparable uncontrolled sale price" on the basis of the aforementioned data satisfies the requirements set forth in section 1.482-2(e)(2), Income Tax Regs., for the application of the comparable uncontrolled price method. The IFA does not disclose the identity of its reporting members, thus, making it impossible for us to determine whether the reported transactions are "uncontrolled sales" as required by section 1.482-2(e)(2)(ii), Income Tax Regs. The circumstances involved in the transactions reported by the IFA are different from those at issue herein. The range of transaction prices contained in the IFA compilations include the differential because of transportation costs to point of delivery, e.g., rafts in the water, brow log or deck at a plant, loaded on rail cars at reloads, and other special handling costs. Export *105 sales, viz, transactions for export outside the United States, excluded sales on an F.A.S. or on a loaded ship basis. Respondent's expert stated in his report that "use of IFA data [are] assumed to be a conservative approach as compared to Department of Commerce data which is supposed to be log sales F.A.S." The regulations however, do not require that a conservative approach be taken but that -- where there are differences between the physical property and circumstances involved in the controlled and uncontrolled sales -- the differences have a definite and reasonably ascertainable effect on price. The controlled sales at issue herein were F.A.S. Port Aberdeen; the transactions in the IFA's compilation of export sales excludes sales F.A.S. Differences in terms of transportation generally have a definite and reasonably ascertainable effect on price, so that they do not normally render the uncontrolled sales noncomparable to the controlled sales. See section 1.482-2(e)(2)(ii) (Example 1), Income Tax Regs. However, even assuming, arguendo, that the transactions compiled by the IFA in the composite log sales analyses are uncontrolled sales, we are unable to make a reasonable *106 adjustment for the difference in the terms of transportation due to the fact that the specific terms of the said transactions cannot be ascertained from the data. We therefore reject respondent's determination of an arm's-length price. It is quite plain from the language of the regulation, section 1.482-2(e), Income Tax Regs., that the purpose for the application of the comparable uncontrolled price method is to proffer a relatively precise mechanism for determining comparable arm's-length price. Indeed this method is supposed to be the method "likely to result in the most accurate estimate of an arm's-length price." Section 1.482-2(e)(1)(ii), Income Tax Regs.
Industry averages are, in most cases, of uncertain reliability in determining arm's-length prices. E.I. Du Pont de Nemours & Co. v. United States,608 F.2d 445, 452 (Ct. Cl. 1979); Edwards v. Commissioner,67 T.C. 224, 236-237 (1976). Cf. Major Coat Co. v. United States,543 F.2d 97, 116 (Ct. Cl. 1976). The regulations do not require us to grope for some figure drawn out of general statistics. Respondent argues that the Court of Appeals for the Second Circuit, to which *107 appeal from our decision would lie, has sanctioned the use of published industry prices to sustain the validity of a section 482 allocation, citing United States Steel Corporation v. Commissioner,617 F.2d 942 (2d Cir. 1980), revg. T.C. Memo. 1977-140 and T.C. Memo. 1977-290. In United States Steel Corporation, the Second Circuit rejected the Commissioner's determination that certain income of a foreign subsidiary was subject to reallocation to the taxpayer, a vertically integrated producer of steel, and held, inter alia, that the taxpayer had met the burden of showing that the fees it paid were arm's-length prices. The court noted that had different facts been developed, the Commissioner could have countered the taxpayer's showing and sustained the validity of the reallocation. The court further stated: Such a counter-showing would have required evidence that Navios' charges, although freely paid by other, independent buyers, deviated from a market price that the Commissioner could have proved existed -- for example, if worldwide ore-shipping contracts had been recorded and published during the period in question. [617 F.2d at 948] *108 We think that the above-quoted language was obiter dictum, not meant to set a standard according to which future cases were to be judged. Moreover, the situation presented in United States Steel Corp. v. Commissioner,supra, was governed by section 1.482-2(b), Income Tax Regs., and not by section 1.482-2(e)(2), Income Tax Regs.
We are satisfied that petitioner has overcome respondent's presumption of correctness. We must therefore determine, from the record before us, and without the benefit of any presumptions, whether any allocations of income between petitioner and NIC are proper. Eli Lilly & Co. and Subsidiaries v. Commissioner,supra;American Terrazzo Strip Co. v. Commissioner,supra;Ach v. Commissioner,supra.Under the agreement dated November 17, 1967, NIC was obligated to acquire all the export quality logs produced from the Key Timber property at cost plus 4 percent. In addition, NIAC was entitled to payment from NIC for the cost of non-export quality logs. In approving NIAC's purchase of Key Timber, NIC intended to assure a source of exportable logs to Japan. Petitioner argues *109 that the aforesaid agreement was consistent with industry practice in the forest products industry in the Pacific Northwest and, hence, reflected arm's-length terms. Respondent contends that, pursuant to the November 17, 1967 agreement, petitioner was denied any gain from the appreciation in the value of standing timber or the increase in the prices of export logs during the period from 1967 to 1975 and retained the risk of loss from fire, insects and acts of God. This, respondent argues, had the ultimate effect of removing these gains from the United States tax base. We are satisfied, based on the evidence before us, that the agreement between petitioner and its parent reflected prices that would have been paid by unrelated parties for the same or similar products. Log exports were carried out in essentially two different ways in the Pacific Northwest during the years in issue: (1) Independent log brokers and large timberland owning diversified companies warehoused their logs and sold them to the highest bidder, (2) American loggers, and the American subsidiaries of Japanese corporations, sold exclusively to one customer on a commission, or some other form of markup basis. *110 The November 17, 1967 agreement belongs to the latter category. NIAC sold export quality logs from Key Timber to NIC at cost plus a commission. In addition to the original stumpage price, the "cost" -- on the basis of which the commission was computed -- included real estate taxes, interest on the unrecovered purchase price (capitalized on the basis of the prevailing interest rate), logging plans, road building, log cutting, hauling the logs to the booming ground, storing, sorting, and bundling the logs, moving the logs to port, scaling and grading, and third party supervisory costs for the foregoing operations which were proformed by Elmore. The booming ground for the logs in the Grays Harbor area was also provided by Elmore. Elmore was compensated for its services on the basis of the volume of logs handled, and exported to Japan by NIAC. Petitioner's 4 percent commission was computed on the F.A.S. cost of the logs, including the compensation received by Elmore for its services. Petitioner argues that the agreements and invoices of sales between M&R and NIAC and between Dant & Russell and Ataka are comparable to the agreement between NIAC and NIC, dated November 17, 1967. *111 Respondent argues that the aforesaid contracts are not comparable to the agreement in issue because those contracts specified the quantity and time of delivery of the logs, usually within 3 years from the date of the contract, to be sold at a set price, or at cost plus commission. The contracts between M&R and petitioner provided for M&R's sale of logs to petitioner at a stated price which, presumably, included a profit. Starting in 1973, the prices were to be adjusted upward or downward if the actual costs of production increased or decreased within one year from the date of the contract. [26] The contracts did not provide for the payment of a commission to M&R by NIAC. The contracts between Ataka and Dant & Russell specified prices, quantities, and species of logs to be sold on a F.O.B. Truck, Port Angeles, or Blagen Yard, Hoquiam, Washington, basis. Prices were subject to adjustment if the general industry logging *112 costs increased, or where extra road construction was required. [27] The stated "prices" were a build-up cost reflecting the stumpage, road building, logging costs, and delivery. The stated prices did not contain a profit factor. The contracts provided for the payment of a commission, ranging from 2.5 percent to 5 percent, on the stated prices to Dant & Russell, for obtaining, administering, and supervising the sale under the terms of the agreement. We also have before us the uncontradicted testimony of Noel Johnson, an employee of Dant & Russell for over 30 years, with regard to transactions in which Dant & Russell acquired land and standing timber in its own name, with funds provided by Ataka, on two separate occasions. [28] The aforesaid contracts did not contain a specified period in which the timber standing on the land had to be cut. [29] Rather, the cutting schedule was dependent on Ataka's needs. The land would be sold after the timber was harvested. *113 Section 1.482-2(e)(2)(iii), Income Tax Regs., provides that where there are two or more comparable uncontrolled sales susceptible of adjustment, the comparable uncontrolled sale or sales requiring the fewest and simplest adjustments should generally be salected. Respondent contends that the aforesaid transactions between Dant & Russell and Ataka are not comparable to the November 17, 1967 agreement because (1) Dant & Russell was a mere nominee for Ataka in these acquisitions, and (2) Dant & Russell did not bear the risks attendant to the outright ownership of land and standing timber. Respondent argues, further, that a 4 percent commission was not adequate compensation for petitioner's assumption of the risk of fire, insects, or acts of God which were not, the argument goes, effectively transferred to NIC pursuant to the terms of the general understanding on Key Timberland dated March 19, 1968. (See our findings of fact, supra.) Section 1.482-2(e)(2)(ii), Income Tax Regs., lists some of the variables or differences that may affect the price of property, and that may be considered in determining whether uncontrolled sales are comparable to controlled sales. The list is non-exclusive, *114 and other factors may be considered. The experts in the forest industry who testified at trial about, inter alia, the factors that they considered relevant in analyzing whether the sales of logs from Key Timber pursuant to the terms of the November 17, 1967, were at arm's-length prices, agreed that the assumption of risk, and not ownership was the important factor. Regardless of whether cutting rights or land and timber are acquired, the risks of (a) a down-swing in the market at a time when the purchaser has a commitment to pay at a level that the market will not be able to support, and (b) that the timber cruise on the basis of which the purchase was made was not accurate, are present. The ownership of timber entails the additional risk of loss of timber from fire, insects, and acts of God. It is customary in the timber industry to cruise approximately 20 percent of the timberland in making an estimate of the quantity and quality of the standing timber. Deviations form the cruise results are usual, and to be expected. The ownership of timberland does not adversely affect this risk, as it is also present when cutting rights are acquired. The most significant of those *115 risks is the sudden drop in market prices. Because of the fact that the objective of both the Federal and the state governments was to maintain a sustained yield cutting program, viz, a stable flow of timber to the market, the quantities of timber offered for cutting were not adjusted to respond to the rising or falling timber prices. The risk of declining prices could be avoided by entering into a fixed price plus commission arrangement. Petitioner effectively protected itself from the risk of declining prices by entering into the November 17, 1967 agreement. Respondent argues that, by entering into this agreement petitioner was foregoing the chance of increasing prices. This is true however, of all the contracts before us, to the extent they failed to provide for higher prices should the market go up. We note that the adjustments provided for in the contracts before us were for increasing or decreasing costs, not for increasing or decreasing market prices.In this sense, petitioner's agreement with NIC is no different from the contracts between Dant & Russell and Ataka, and NIAC and M&R. The risk of fire was not transferable. The probability, however, of salvaging fire damaged *116 logs was extremely high. There is evidence in the record to the effect that the typical forest fire in the Pacific Northwest region of the United States will not destroy all the merchantable timber in the burned stand. The fire will destroy undergrowth and slash and char the outer bark but leave many of the green, standing trees alive. The hotter firest will generally kill most of the standing trees, but loss of sound, merchantable timber would be rather small, depending on how soon the burned stand is logged after the fire. Salvage of fire-killed trees is high; 80 percent or more of the merchantable timber which could have been harvested without a fire can generally be expected to be salvaged, according to the evidence. This is due, in part, to the fact that the portions of a tree that will burn easily -- decayed, injured, or pitchy wood -- are not marketable even without a fire, while the merchantable green, living timber is hard to ignite and keep burning. Where chippable material is lost, fire-salvaged logs are sometimes downgraded. Insurance is not available to the forest industry to protect it against loss of timber due to fire. Timberland owners were not concerned with *117 the risk of loss of timber due to volcanic activity in the late sixties since there had been no major volcanic eruptions in the region. [30]
As to other acts of God, we note that Key Timber consisted of 30 to 50 noncontinguous parcels in three different counties in the State of Washington, thus making it improbable, if not impossible, that a natural disaster could destroy, and render unsalvageable, all the standing timber. We are satisfied that the 4 percent commission was adequate compensation for petitioner's services and assumption of the risks inherent to the ownership of timberland, and we accordingly hold for petitioner on this issue. Based on the resolution of the first issue, we need not address the issue whether the amounts allocated to petitioner under section 482 constituted constructive dividends from petitioner to its parent, subject to the withholding provisions of section 1442. Issue 3: Cancellation of the agreement dated October 1, 1968 and November 17, 1967 and Issue 4: NIAC's net profit from the sale of the Key Timber property
The third and fourth issues for us to decide are whether the journal *118 entries, purporting to reflect the cancellation, on July 1, 1975, of the agreements between petitioner and its parent, dated November 17, 1967, and October 1, 1968, and the substitution of a new agreement, resulted in a constructive dividend, and whether petitioner's net profit from the sale of standing timber and land to an unrelated third party should be increased. Before we decide these issues we must dispose of a controversy between the parties regarding the effect of certain stipulations. Paragraphs 31, 62, and 63 of the stipulation of facts provide as follows: 31. On July 1, 1975, petitioner held in inventory, cut logs with a cost of $17,807,099.00. The fair market value of said inventory on July 1, 1975 was $11,717,889.00. Petitioner, claims that pursuant to an agreement between NIC and petitioner, NIC was obligated to purchase said inventory at petitioner's cost and pay petitioner a commission of 1% at the time of purchase. Petitioner further claims that on July 1, 1975, NIC's purchase obligation was canceled and NIC agreed to pay petitioner $6,089,210.00, representing the difference between the purchase obligation and the fair market value of the logs on the date *119 of cancellation. Respondent claims that both the alleged transaction on July 1, 1975 with respect to petitioner's cut log inventory and the creation of a $6,090,808.00 credit to NIC by reason of the cancellation of the [November 17] 1967 agreement marked 15-0 lacked economic substance and should not be given effect for tax purposes. 62. The parties agree that if the Court gives effect to the Key Timber part of the transaction referred to in paragraph 31 of the Stipulation and Exhibit 23-W, such that petitioner's basis in Key Timber is increased to $8,956,385 as of July 1, 1975, then petitioner is not liable for the alleged deficiency in withholding of income tax at source in the amount of $608,921 arising from the alleged dividend distribution attributable to log inventory acquired on behalf of Nissho Iwai Corporation for which petitioner was allegedly not fully reimbursed, as set forth on the last page of the Notice of deficiency involved herein. 63. The parties agree that if the Court does not give effect to the Key Timber part of the transaction referred to in paragraph 31 of the Stipulation and Exhibit 23-W, such that petitioner's basis in Key Timber is not increased, than *120 petitioner is liable for a withholding tax deficiency on account of the sale of the cut log inventory after July 1, 1975 and that the amount of the constructive dividend distribution is only $4,563,963, reduced by the actual profit reported by petitioner on its sales of such inventory to Nissho Iwai Corporation in accordance with the terms of paragraph 64 and Exhibit 22-V. Petitioner argues that the parties agreed, as per paragraph 62 of the Stipulation, that the existence of a constructive dividend, in the amount of $6,089,210, from petitioner to its subsidiary is dependent upon our determination concerning the pricing adjustment relating to sales of Key Timber logs, pursuant to section 482, viz, that if the said pricing adjustment is erroneous, then there is no constructive distribution by petitioner to NIC and vice versa, if the pricing adjustment under 482 is upheld there is a constructive distribution. Respondent contends that regardless of our determination with respect to the pricing adjustments under section 482, we must still address the issue of whether the July 1, 1975 journal entries had economic substance and should be given effect for tax purposes. We agree with *121 respondent. The terms of paragraphs 31, 61, and 62 are clear in that our determination with regard to the existence of a constructive dividend resulting from the July 1, 1975, agreements, which we hereinafter address, is independent of, and unrelated to, our determination with respect to respondent's pricing adjustment pursuant to section 482. The questions presented by issues 3 and 4 are related and we discuss them together. We have made extensive findings of facts. We think, however, that a brief summary of the events culminating with the journal entries of July 1, 1975, is pertinent to a proper understanding of the parties' contentions. NIAC and NIC agreed, on October 1, 1968, that petitioner was to be paid a one percent commission for outright sales and purchases between NIC and petitioner, and a .5 percent commission for third party sales in which NIAC acted as a broker. The agreement -- which was to be renewed automatically from year to year unless either party gave notice of its intention not to renew -- was not canceled and was in effect during the years in issue. By letter dated May 1, 1969, an agreement between NIC and NIAC, pursuant to which NIAC was to acquire *122 and hold in inventory a maximum of 50,000,000 Scribner feet of exportable quality logs, at prices to be negotiated from time to time, but not less than NIAC's acquisition cost, was confirmed. The agreement was later modified to increase the maximum of Scribner Feet in inventory to 200,000,000 Scribner feet. As of July 1, 1975, petitioner held an inventory of cut logs with a fair market value of $11,717,889, and a cost basis to NIAC of $17,807,099. [31] The parties agree that NIC was obligated, pursuant to the above-mentioned agreements, to reimburse NIAC for its cost of acquiring the inventory of cut logs. Pursuant to the agreement dated November 17, 1967, NIC was obligated to purchase all logs produced from Key Timber at cost plus a 4 percent commission, for export quality logs, and at cost, for nonexport quality logs. As of July 1, 1975, petitioner's capitalized cost in Key Timber totaled $2,865,577. The fair market value of the standing timber remaining on Key Timber was $8,956,385. According to the terms of the first memorandum of understanding dated July 1, 1975, NIAC was to continue to offer export quality logs to NIC, at their prevailing fair market *123 value at the time of order. A second memorandum of understanding dated July 1, 1975, stated that NIAC was to assume all risks, liabilities, and obligations with respect to the log and standing timber inventory, and that NIAC was to retain all risks, liabilities, and obligations, with respect to the Key Timber land.
The terms of the aforementioned second memorandum of understanding were purportedly reflected by NIAC on its books and records by way of some accounting entries (see our findings of fact, supra). Respondent contends that petitioner sold its entire cut log inventory to its parent during 1975 and 1976, at prices below those which petitioner was contractually entitled to, and that this sale resulted in a constructive distribution from petitioner to its parent. [32]
In support of these contentions, respondent argues that the journal entries made by petitioner's accountant on its books and records on July 1, 1975 lacked economic substance and should not be given effect for tax purposes. Respondent argues, further, that the ultimate purpose of the July 1, 1975 journal entries was to shift $6,090.808 of capital gain outside the United States. *124 As stated supra, the parties agree that NIC was obligated, pursuant to the terms of the agreements dated October 1, 1968, and May 1, 1969, and the amendment dated April 15, 1970, to reimburse petitioner for the cost of its cut logs inventory. The parties further agree that, beginning on July 1, 1975, and at all relevant times thereafter, petitioner sold logs to NIC, from its cut log inventory, at the prevailing fair market values. Finally, it is also clear that, after July 1, 1975, petitioner and NIC no longer dealt with each other in accordance with the terms of the original agreements. The dispute between the parties stems from the accounting entries, dated July 1, 1975, made by petitioner's accountant at the request of some of petitioner's officers. Respondent argues that "[i]nstead of what appears to have been a very simple mutual concellation of their agreements, petitioner and NIC have created an artificial overlay of accounting entries and documents which required no meaningful shifting of funds between the parties since the entries canceled each other out." Petitioner argues that: (1) it agreed with NIC to change the pricing terms under which petitioner supplied *125 NIC with logs, (2) before this agreement, contained in the first memorandum of understanding dated July 1, 1975, could be put into effect "NIC had to make petitioner whole" in accordance with the terms of the agreement dated October 1, 1968; and (3) that petitioner was "made whole" by NIC as a result of the provisions of the second memorandum of understanding dated July 1, 1975, pursuant to the terms of which NIC turned over to NIAC the right, having a value of $6,090,808, [33] either to purchase Key Timber logs at cost, or to cancel the agreement, dated November 17, 1967, by paying NIAC its unrecovered cost for Key Timber and assuming ownership itself. Pursuant to the provisions of the agreements dated October 1, 1968, May 1, 1969, and the amendment dated April 15, 1970, NIC could cancel the agreement to buy cut logs at cost plus a 1 percent commission should NIAC's costs become higher than what NIC was willing to pay for the logs. The cancellation, however, was not to affect NIC's obligation *126 with respect to the logs that NIAC had acquired to contracted to acquire prior to the date of cancellation. Thus, the cancellation of the said agreements did not affect NIC's obligation with respect to NIAC's inventory of cut logs. Paragraph 4 of the agreement dated November 17, 1967, reserved to NIC the right to cancel the agreement at any time, with the proviso that NIC was to pay to NIAC the cost of Key Timber and all logs produced from Key Timber. Petitioner did not have the right to cancel the agreement, nor was it obligated to reimburse NIC for the difference between the fair market value of Key Timber and/or the logs produced from Key Timber at the time of cancellation. The agreement did not contain a provision, and petitioner did not introduce any other evidence, that NIAC had to transfer ownership of Key Timber to NIC upon cancellation of the agreement and NIC's payment of the unrecovered cost of Key Timber, as contended by petitioner. Thus, rather than having been "made whole," petitioner ended up paying NIC what it never owed, for a "right" which NIC never had, i.e., the difference between the cost of the Key Timber property and log inventory and the fair market value *127 thereof, in the net amount of $6,090,808. We hold therefore, that the journal entries of July 1, 1975, did not comport with the economic realities and the rights and obligations of the parties under the agreements, should not be recognized for tax purposes, and resulted in constructive dividends from petitioner of NIC during the years 1975 and 1976. [34]
On February 27, 1977, petitioner sold the Key Timber property to an unrelated third party for $8,600,000. Respondent determined, in his notice of deficiency dated October 29, 1982, that petitioner's basis in Key Timber was $1,785,146, and not $6,237,811, as claimed by petitioner, and increased *128 the amount of petitioner's net profit by $4,457,665. The parties are in agreement that the resolution of this issue depends on whether we sustain the journal entries of July 1, 1975, which increased petitioner's basis in Key Timber from $2,865,577 to $8,956,385. We have decided supra, that the said increase was not required by the agreements between the parties and that it is not to be given effect for tax purposes. On this issue, therefore, we hold for respondent. In order to reflect the foregoing, as well as concessions made by the parties, Decision will be entered under Rule 155.
Footnotes
1. Respondent determined, in his statutory notice of deficiency that (1) petitioner sold inventory to its parent corporation in 1975, for which it was not fully reimbursed, and (2) said sale resulted in a constructive distribution, subject to the 10 percent withholding requirement, from petitioner to its parent, in the amount of $6,089,210. Based on the evidence introduced at trial -- that part of the aforementioned inventory was sold by petitioner to its parent in 1976 -- respondent filed a motion for leave to amend his answer to conform to the proof presented at trial, which motion was granted on January 23, 1985. By amendment to his answer filed on January 23, 1985, respondent asserted a deficiency in withholding tax for the year 1976 in the amount of $193,636.87. The parties agreed that the burden of proof with regard to the new matter is on petitioner.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
3. Earlier corporate names of petitioner include the Nissho Co., Ltd. and Nissho-Iwai American Corporation. ↩
4. Earlier corporate names of NIC include the Nissho Co., Ltd. and Nissho-Iwai Co., Ltd. ↩
5. The term "returns" refers to both U.S. Corporate Income Tax Returns, Form 1120, and U.S. Annual Returns of Income Tax to be Paid at Source, Form 1042.↩
6. The parties have stipulated that all agreements, rights, and obligations of NPC are to be deemed those of petitioner for purposes of the instant case.↩
7. Laws had been adopted prior to 1967 by the province of British Columbia, Canada, prohibiting log exports, except in unusual circumstances. In Alaska, the U.S. Forest Service had adopted regulations restricting the export of logs. Log exports from State of Oregon land were prohibited, except for log surplus.↩
8. The companies were able to do this by selling some logs on a warehouse basis, viz, by warehousing their logs and selling them at the highest possible price, but thereby also taking the risks of sudden drops in the market.↩
9. Maximum log length for scaling purposes was 40 feet.↩
10. As of May 1, 1969, the agreement between NIC and NIAC, providing for a one percent commission to be payable to NIAC on all outright sales and purchases between them was in effect. This agreement was not challenged by respondent and was not subject to any of his adjustments under sec. 482.↩
11. Elmore's services included: (1) surveying opportunities for the acquisition of logs suitable for export to Japan from the timber and timberlands in the Olympic Peninsula around the Grays Harbor area; (2) reviewing all State of Washington timber sales; (3) providing assistance in determining the price to be offered for logs, timber or timberland; (4) assisting in the negotiation of contracts for logging, building roads, and hauling of logs; (5) supervising the logging, scaling, and hauling operations; (6) maintaining a processing yard exclusively for petitioner's business; (7) maintaining an inventory of NIAC's logs; (8) investigating the financial standing of potential buyers for logs; (9) assisting NIAC in determining which logs were to be exported and which were to be sold domestically; (10) receiving, sorting, trimming, bucking, scaling, grading, and loading export logs; (11) submitting reports; and (12) reviewing invoices submitted by NIAC in connection with all operations for which Elmore had responsibility, and recommending as to payment.↩
12. See fn. 6.↩
13. Based on the prevailing interest rates.↩
14. The parties have stipulated that, for purposes of the instant case, the land and timber comprising the Key Timber property are to be considered as owned directly by NIAC.↩
15. The average prices used by respondent were weighted by the percentage of each grade of export logs determined by him in relation to the total for each species. In computing the said weighted average prices, respondent assumed that all export volume of Douglas fir, hemlock and spruce was No. 2 sawlog grade or better. ↩
16. In thousand board feet, Scribner scale. ↩
17. Per thousand board feet, Scribner scale.↩
18. In thousand board feet, Scribner scale. ↩
19. For the Grays - Willapa Harbors District.↩
20. This amount included, as an item of cost, ocean freight, also called bunker surcharges, of $1,525,247. In 1976, petitioner billed NIC for this ocean freight expense and included the sum of $1,525,247 in income.↩
21. Thus: [c-(a+b)] - (d-e) = f.↩
22. As follows: ↩
Period
Sales
July - September, 1975
$ 5,986,438.22
October - December, 1975
2,281,529.05
Subtotal
$ 8,267,967.27
January - March, 1976
1,308,944.07
April - June, 1976
1,748,704.52
July - September, 1976
673,129.71
Total Sales
$11,998,745.57
23. In some instances the taxpayer's burden of proof has been expressed in the conjunctive, rather than the disjunctive. This is a distinction without a difference as the terms used are synonymous. See Eli Lilly & Co. and Subsidiaries v. Commissioner,84 T.C. 996, 1131, n. 69 (1985); Foster v. Commissioner,80 T.C. 34, 142, n. 59 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985); Wilson v. Commissioner,530 F.2d 772, 779↩, n. 1 (8th Cir. 1976) (concurring opinion).
24. The regulations under sec. 482 were implicitly amended by sec. 44(b)(2) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 559. The said change does not affect the sections of the regulations cited herein. ↩
25. Sec. 1.482-2(e)(1)(V), Income Tax Regs.↩, provides a special rule, inapplicable here, for determining an arm's-length price for a mineral product.
26. The contracts dated April 2, 1973, June 4, 1973, July 13, 1973, and October 9, 1973, specifically stated that F.A.S. prices had been calculated to allow a profit of $13.88 per thousand Scribner feet. Prices were to be adjusted to insure said amount of profit.↩
27. The contracts dated January 12, 1973, April 2, 1973, July 13, 1973, and October 9, 1973, did not contain the aforesaid provision.↩
28. Dant & Russell had an exclusive sales agreement with Ataka from 1967 through the mid-seventies. ↩
29. The timber acquired through the state, viz, the purchase of cutting rights, had to be cut during the course of approximately 3 years, although extensions were obtainable, at a charge.↩
30. The Mount St. Helen's eruption occurred in 1980.↩
31. See fn. 20.↩
32. See fn. 1.↩
33. The difference between the fair market value of the standing timber remaining on Key Timber, $8,956,385, and NIAC's capitalized cost in Key Timber, $2,865,577, as of July 1, 1975.↩
34. See fn. 1. We note that in the amendment to his answer, filed on January 23, 1985, respondent asserted a deficiency in withholding tax for the year 1976 in the amount of $193,636.87. No change, however, was made to the determined deficiency in withholding tax for 1975, based on the assumption that the entire inventory of cut logs was sold by petitioner to its parent in 1975. Respondent's determination with respect to the withholding tax liability for 1975 is, therefore, to be reduced by § 193,636.87 in the Rule 155 computation.↩